UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HECTOR RUELAS,<br><br>               Plaintiff,<br><br>     v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration,<br><br>               Defendant. | NO. CV 05-00144 (SS)<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff seeks review of the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying his application for Social Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB") under Title II and XVI of the Social Security Act. The Agency denied the applications at the initial and reconsideration stages.

On December 5, 2002, Plaintiff sought review before an Administration Law Judge ("ALJ"). On May 6, 2003, the matter proceeded to a hearing before an ALJ. On June 5, 2003, the ALJ issued an unfavorable decision. Plaintiff sought review with the Appeals Council.

On November 10, 2004, the Appeals Council denied the request for review. This action of the Appeals Council rendered the decision of the ALJ final. Plaintiff seeks review of the Commissioner's decision denying benefits. The parties have consented, pursuant to 28 U.S.C. section 636(c), to the jurisdiction of the undersigned Magistrate Judge.

Plaintiff is represented by Laura Krank, Esq. Defendant is represented by Assistant United States Attorney Cedina M. Kim. This matter is before the Court on the parties' Joint Stipulation that was filed on November 22, 2005. For the reasons stated below, the decision of the Commissioner is REVERSED and REMANDED.

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI benefits on May 17, 2002 and for DIB benefits on June 5, 2002. He alleged an inability to work due to blindness in his right eye, hearing loss, and headaches. His applications were denied by the State Agency both initially and upon reconsideration. On December 5, 2002, Plaintiff filed a request for hearing. On May 6, 2003, a hearing in this matter was held before ALJ Richard L. Leopold. Plaintiff was represented at the hearing by Lilly Atkinson, a non-attorney.

On June 5, 2003, the ALJ denied Plaintiff's SSI and DIB claims. On November 10, 2004, the Appeals Council denied the request for review. This action of the Appeals Council rendered the decision of the ALJ final. Plaintiff seeks review of the Commissioner's decision denying benefits.

**FACTUAL BACKGROUND**

**A.   Dr. Curtis's Evaluation of Plaintiff**

In support of his application for benefits, Plaintiff submitted the medical reports of Dr. Thomas Curtis, a psychiatrist and the medical examiner in Plaintiff's state workers' compensation case. (AR 225-237, 399-425, 427-431, 432-442).

On January 6, 2003, Dr. Curtis conducted a mental status examination on Plaintiff. Dr. Curtis reported that Plaintiff had a history of depressive and anxious emotional complications of industrial injuries resulting from an impalement nail injury to his right eye, causing the loss of his eye. (AR 417). Plaintiff also experienced headaches, a loss of hearing, a buzzing sound, and a burning sensation of pain in the internal right ear, as well as neck/shoulder/back muscle tension/pain problems. (Id.).

Plaintiff proceeded with vocational rehabilitation in "fuel injection," but was unable to find subsequent employment. (AR 418). Plaintiff continued to experience an obsessive and irrational fear of injury to his left eye with the possibility of becoming totally blind. (Id.). Upon examination, Plaintiff exhibited abnormal behavior with manifestations of emotional withdrawal, visible anxiety, and a depressive facial expression. (Id.). Plaintiff showed emanations of fear and insecurity. (Id.). Plaintiff had issues with vocational disruption, low self-esteem, and reduced self-confidence. (Id.).

Plaintiff told Dr. Curtis that before his injury he was a happy and outgoing person, but that after his injury he was "quiet." (Id.). Dr. Curtis noted that Plaintiff's degree of permanent emotional impairment would be estimated as moderate. (AR 419).

Due to Plaintiff's depression, anxiety, emotional withdrawal, insecurity, damaged self-esteem, reduced self-confidence, impatience, and irritability, Dr. Curtis assessed that there would be noticeable-to-marked impairment in his psychological functioning in the work place, in his capacities for concentration, attention, memory, and general cognition, in his ability to comprehend and follow the instructions of his vocational level, and in his ability to perform the simple, routine and repetitive tasks of his vocational level. (Id.).

Dr. Curtis noted that Plaintiff's frustration, emotional depletion, mistrust, fatigue, sleep disturbance, diminished psychological energy, decreased cognition, mental confusion, and headaches would also likely cause noticeable-to-marked impairment in his ability to get to work, stay at work, keep working, get all the work done correctly and on time at an appropriate work pace, to perform the more complex and varied tasks of his occupational level, to relate to people at work, and to serve as a manager of his peers. (Id.). Plaintiff would have a noticeable-to-marked impairment in assuming responsibilities for direction, planning, control, negotiating, influencing people, making generalizations and evaluations, and recognizing hazards. (Id.).

Dr. Curtis reported that there would be a noticeable-to-marked impairment in relating to people at work due to elements of withdrawal,

mistrust, alienation, and potential difficulties with flare-ups of emotional reactivity. (Id.). Also, due to Plaintiff's problems with sleep disturbance, depression, and fatigue, there would be noticeable-to-marked impairment in maintaining a consistent work pace. (Id.). These factors would render the performance of more complex and varied tasks to be noticeably-to-markedly difficult. (Id.). Dr. Curtis noted that Plaintiff displayed memory impairment. (Id.).

Dr. Curtis concluded that the specific psychiatric work restriction would preclude Plaintiff from competing within significant sectors of the labor market. (Id.). Dr. Curtis stated that Plaintiff would be precluded from jobs with a risk of eye injury, i.e., construction sites, wood shops, etc. (Id.).

Dr. Curtis noted that Plaintiff was emotionally adjusted to a non-work situation. (Id.). He stated that if and when Plaintiff attempted to return to a normal and regular work situation, his symptoms would be expected to worsen. There would be an increase in his the severity of his symptoms that would correlate with a higher level of emotional impairment. (Id.).

Dr. Curtis reported that there would be other important areas of consideration relevant to Plaintiff's diminished future earning capacity and his ability to compete with his peers to obtain and hold a job in the labor market at his occupational level. (Id.). Further, Plaintiff's performance during an employment application interview would probably be significantly hampered by visible anxiety, insecurity, and damaged self-esteem. (Id.). Plaintiff's physical disability should be

1  evident in employment interviews and examination situations.  (AR 420).
2  Dr. Curtis stated that this should also significantly limit his
3  employability.  (Id.).

5      Dr. Curtis concluded that all of these factors would correlate with
6  an overall moderate degree of emotional impairment at about the 50 per-
7  cent standard level to be adjusted for age and occupational variants
8  relevant to the labor market at large.  (Id.).

10      Dr. Curtis conducted a prior mental status examination of Plaintiff
11  on May 14, 2002.  Dr. Curtis reported that Plaintiff kept his right eye
12  closed for the majority of the session.  (AR 228).  Dr. Curtis noted
13  that Plaintiff was initially defensive, guarded, reluctant to proceed,
14  and lacking trust due to natural personality temperament in conjunction
15  with depression, anxiety, fatigue, and irritability caused by pain,
16  physical disability, and the loss of vision in the right eye.  (Id.).

18      Dr. Curtis reported that Plaintiff's manner of communication was
19  depressed, particularly when revealing the loss of vision in the right
20  eye and the obsessive and excessive fear of injury to the left eye.
21  (Id.).  Dr. Curtis stated that Plaintiff exhibited abnormal behavior
22  with manifestations of emotional withdrawal, internal pressure, visible
23  anxiety, ill-composed, and depressive facial expressions and psychomotor
24  retardation.  (Id.).

26      During the exam, Plaintiff showed fear, insecurity, worry, and
27  irritability.  (Id.).  Plaintiff had elements of loss, confusion and
28  fatigue.  (Id.).  Plaintiff exhibited post-traumatic reactions of fear,

anxiety, phobic-like aversion to reminders, attention and concentration problems, depression, sleep disturbance, exaggerated startle response, a disinclination to leave the home alone unless necessary, and nightmares that he is being held down. (Id.).

Dr. Curtis declared that Plaintiff demonstrated diminished cognitive functioning in the clinical interview situation. (Id.). Plaintiff revealed defects in his short-term memory and demonstrated difficulty with reading comprehension. (Id.). Dr. Curtis assessed that it was most likely that Plaintiff's cognitive deficits were caused by emotionally reactive confusion. (Id.).

Plaintiff did not appear to be in loss of contact with reality in the form of visual or auditory hallucinations. (Id.). There was no evidence of frank paranoia or delusions of persecution. (Id.). There appeared to be an absence of frank schizophrenia or other psychosis. (Id.).

Overall, Plaintiff's psychological test results were abnormal. (AR 229). Plaintiff was in the "mild" range of subjective depression. (Id.). The Beck Scale for Suicidal Ideation ("BBS") serves as a screening device to detect suicidal ideation and it also measures the severity of suicidal potential and risk. (Id.). The ratings for nineteen items are calculated such that the total BBS score can range from zero to thirty-eight. (Id.). Plaintiff scored a zero. (Id.).

Plaintiff's anxiety was tested to be within normal limits. (Id.). Dr. Curtis stated that this result probably reflected a defensiveness

against admitting to the symptoms of abnormal anxiety, or a failure on the part of Plaintiff to report the more subtle and hidden signs of anxiety. (Id.).

Plaintiff exhibited excessive gentleness, submissiveness, and vulnerability to mental distress and disorder. (Id.). Dr. Curtis observed that Plaintiff indicated a greater sensitivity than average to the development of mental distress and disorder. (Id.).

Dr. Curtis reported that Plaintiff indicated deteriorated defenses, low ego strength, dissatisfaction with self, and excessive self-criticism. (Id.). Plaintiff's somatic complaints were an expression of emotional disturbance. (AR 230). The somatic complaints probably comprised a combination of hypochondriacal, psychosomatic and psycho-physiological symptoms. (Id.). Plaintiff indicated suppressed hostility, passive-aggressiveness, repressive denial of interpersonal conflict, exaggeration of physical distress for sympathy, and narcissistic self-absorption. (Id.).

**B.   Consultative Examination**

On September 23, 2000, Plaintiff was cutting a piece of wood with a table saw when a nail flew underneath his protective glass striking his right eye. (AR 227). Plaintiff underwent two surgeries to his right eye at USC Hospital. (Id.). Dr. Steven Liebowitz, an ophthalmologist, reported that there was no chance of restoring the vision in Plaintiff's right eye, and that if the pain continued, the eye would have to be surgically removed. (Id.).

1   Plaintiff developed a loss of hearing, a buzzing sound, and a
2   burning sensation in the internal right ear.  (Id.).  He developed pain
3   problems in his neck.  (Id.).  Plaintiff continued to experience
4   obsessive and excessive fear of injury to his left eye with the
5   possibility of becoming totally blind.  (Id.).  Plaintiff became
6   depressed, excessively fearful, worried, irritable, and unable to obtain
7   a restful night's sleep.  (Id.).

9   Plaintiff was examined by a consultative physician in connection
10  with his application for benefits.  Dr. Sohini Parikh conducted an
11  psychiatric evaluation on August 2001.  (AR 19).  Dr. Parikh found that
12  Plaintiff did not have any work related mental limitations.  (Id.).  To
13  the extent that the Court's analysis of Plaintiff's claims requires a
14  further discussion of the consultative examinations, it will be provided
15  below.

17  **C.   Plaintiff's Testimony**

19  At the hearing before the ALJ, Plaintiff testified that he stopped
20  working in September 2000 at his longtime job as a foreman for Shutters
21  By Angel.  (AR 34).  He testified that his primary duty there was to
22  build shutters.  (Id.).  Plaintiff elaborated that he made the frames
23  of the shutters, riveted the wood and used various machines, including
24  table saws, sanding machines, cutting machines, and board machines.
25  (Id.).  Plaintiff supervised around fifteen people every hour.  (Id.).
26  On September 23, 2000, Plaintiff suffered an injury to the right eye
27  secondary to an accident at work in which a nail flew into his eye while
28  he was cutting wood using a steel saw.  (AR 427).  Plaintiff has not

1  worked since the accident due to headaches, depression, anxiety, and
2  asthma.  (AR 35).

4  When asked how he spent his days, Plaintiff replied that he walked
5  around, watched television, and conversed with friends around the
6  neighborhood.  (Id.).  Plaintiff lives with his girlfriend, her two
7  children, and the two children of one of his girlfriend's children.
8  (Id.).  He does not have a driver's license.  (AR 36).  Plaintiff
9  reported that his medication only helps a little and that it causes
10 dizziness.  (Id.).  He visits his doctor either every fifteen days or
11 once a month.  (Id.).  Plaintiff testified that he has "body problems,"
12 loss of hearing in his ear, and constant headaches.  (Id.).

14 Plaintiff testified that he takes two naps a day for approximately
15 between an hour and an hour and a half each.  (AR 45).  When he worked
16 as a foreman, he communicated to his workers in Spanish.  (Id.).
17 Plaintiff declared that he does not speak English well, and that he
18 cannot read or write in English.  (Id.).

### D. The Vocational Expert's Testimony

Ms. Lynne Tracy testified at the hearing as a vocational expert. She identified Plaintiff's past relevant work as a foreman, and stated that the applicable Dictionary of Occupational Titles ("DOT") code would be a carpenter II.  (AR 40).  Ms. Tracy stated that the job is within the medium exertional range and is skilled work.  (Id.).  Ms. Tracy reported that it is not uncommon for a more skilled worker who performs

the same activities is less skilled to be considered a lead or a workman foreman. (Id.).

The ALJ asked the vocational expert a hypothetical involving a person who is thirty-eight years old and has limited education. (Id.). Further, this person can perform medium work, has a mild limitation on attention, concentration, understanding, and remembering. (Id.). The individual would be blind in the right eye. (Id.). He would have a moderate limitation on depth perception. (Id.). Ms. Tracy testified that this individual with these limitations would not be able to perform Plaintiff's past relevant work as a foreman or carpenter. (Id.).

Ms. Tracy stated that this individual could perform other unskilled work that could be done with monocular vision. (Id.). Ms. Tracy listed: (1) hand packing jobs, 4,700 in the greater Los Angeles, Long Beach area, and (2) general labor non-construction, 12,600 jobs. (Id.).

For the second hypothetical, the ALJ described an individual who is "38 years old, [has] limited education, [and can perform] light work with the limitations as described in number one." (Id.). Ms. Tracy responded that this individual could perform: (1) hand packing jobs, 10,000, and (2) general labor non construction, 19,000. (Id.).

**THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her

from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve months. Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. § 404.1520. The steps are:

(1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
(2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.
(3) Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.
(4) Is the claimant capable of performing her past work? If so, the claimant is found not disabled. If not, proceed to step five.

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. § 404.1510.

(5) Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. § 404.1520(a)(4).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity[2], age, education and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. § 404.1520(g). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable, and the ALJ must take the testimony of a

---

[2] Residual functional capacity is "what [one] can still do despite [her] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## THE ALJ'S DECISION

At the first step, the ALJ found that Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. (AR 21).

At the second step, the ALJ found that Plaintiff has severe right eye blindness, as well as "non-severe" asthma, hearing loss, and a mood disorder. (Id.).

At the third step, the ALJ found that Plaintiff's medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (AR 23).

At the fourth step, the ALJ found that Plaintiff is unable to perform any of his past relevant work as a carpenter/foreman/leadworker. (AR 22).

At the fifth step, the ALJ found that Plaintiff has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting more than fifty pounds occasionally, lifting and carrying more than twenty-five pounds frequently, and any work requiring binocular vision and good depth perception. (AR 21). The ALJ stated that Plaintiff's residual functional capacity for the full range of medium work is reduced by a

severe non-exertional limitation. (AR 22). Plaintiff is forty-eight years old, has a limited education, and does not have any acquired work skills that are transferable to the skilled or semiskilled work functions of other work. (Id.). The ALJ concluded that based on an exertional capacity for medium work and Plaintiff's age, education, and work experience, Plaintiff is not disabled. (Id.).

The ALJ found that there are significant number of jobs in the national economy that Plaintiff could perform. (AR 16). Examples include: (1) handpackager, 4,700 medium jobs and 10,000 light jobs in the local economy, (2) non-construction laborer, 12,600 medium jobs and 1,900 light jobs. (AR 22).

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." Id. (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To

15

determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (citing Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

<u>The ALJ Failed To Give Proper Weight To Dr. Curtis's Opinion</u>

The Court agrees that Dr. Curtis's opinion was deserving of treating physician weight. 20 C.F.R. § 404.1502 defines a "treating source" as follows:

> Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). We may consider an acceptable medical source who has treated or evaluated you only a few

16

     times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s). We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source.

Here, the evidence shows that Plaintiff was referred to Dr. Curtis for both treatment and evaluation following his on-the-job injury. (See AR 224-260; 399-442). Plaintiff saw Dr. Curtis on a regular and frequent basis for treatment during the period from 12/14/01 through 5/14/02. (Id.). He returned for further evaluation and treatment in 2003. (Id.). The nature and frequency of Plaintiff's sessions with Dr. Curtis qualify Dr. Curtis as a treating physician. Although the ALJ appears to recognize that Dr. Curtis is a treating physician (AR 19), the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Curtis's opinions. This was error.

Where the treating physician's opinion contradicts the opinion of an examining or consulting physician, the Commissioner must provide "'specific and legitimate reasons' supported by substantial evidence in the record" for rejecting the treating physician's opinion. See Lester v. Chater, 81 F. 3d 821, 830 (9th Cir. 1996); see also 20 C.F.R. § 404.1527(d)(2) (requiring that the Social Security Administration always "give good reasons in [the] notice of determination or decision for the

17

weight [given to the] treating source's opinion"). The ALJ erroneously stated in his decision that "none of the various treating physicians . . . have found that the claimant is incapable of working." To the contrary, Dr. Curtis clearly made such a finding:

> Mr. Ruelas was found to be temporarily totally disabled on a psychiatric basis. . . At present, it would not be possible to estimate, on a psychiatric basis, a return-to-work date for regular or modified work. As well, it cannot yet be determined, on a psychiatric basis, whether or not Mr. Ruelas will eventually be emotionally able to engage in the occupation being performed at the time of the injury. In addition, it would not yet be possible to estimate the residuals of permanent emotional impairment, if any. However, it would appear likely that there will be substantial residuals of permanent emotional impairment.

(Curtis Report, May 14, 2002, AR 231-233). Later, Dr. Curtis opined that Plaintiff's permanent emotional impairment would be "moderate" but did not further define what this meant. (Curtis Report, January 6, 2003, AR 419). Dr. Curtis found Plaintiff's specific functional impairments, on a workers' compensation scale, to be "slight to moderate." (AR 420).

The ALJ failed to give proper weight to Dr. Curtis's findings or provide legitimate reasons for rejecting them. Furthermore, he failed to translate Dr. Curtis's workers' compensation findings into Social Security terms. Although workers' compensation disability ratings are

not controlling in Social Security cases, an ALJ must nevertheless evaluate medical opinions stated in workers' compensation terminology just as he would evaluate any other medical opinion. Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996); Desrosiers v. Secretary of Health & Human Services, 846 F.2d 573, 576 (9th Cir. 1988); Booth v. Barnhart, 181 F. Supp. 2d 1099, 1104 (C.D. Cal. 2002). The ALJ must "translate" terms of art contained in such medical terminology in order to accurately assess the implications of those opinions for the Social Security disability determination. See Desrosiers, 846 F.2d at 576). "While the ALJ's decision need not contain an explicit `translation,' it should at least indicate that the ALJ recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and took those differences into account in evaluating the medical evidence.'" Booth, 181 F. Supp. 2d at 1105.

Here, the ALJ's decision demonstrates that he knew that Dr. Curtis, for a period of three years, continually found that Plaintiff was "temporarily totally disabled." (See ALJ's decision at AR 225-237, 399-425, 427-431, 432-442). However, the ALJ failed to indicate that he considered these findings or weighed them as part of the medical evidence. In addition, the ALJ failed to translate Dr. Curtis's "slight to moderate" findings into their equivalent terms for Social Security cases. As such, remand is required.

\\
\\
\\
\\

**CONCLUSION**

Consistent with the foregoing, IT IS ORDERED that Judgment be entered REVERSING the decision of the Commissioner and REMANDING this case for further action consistent with this opinion. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 16, 2006.

                                            /s/
                                 SUZANNE H. SEGAL
                                 UNITED STATES MAGISTRATE JUDGE